**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 1:21-cr-657-2 (BAH)** |
| **v.** | : | |
| | : | |
| **JAMES PHILLIP MAULT,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence James Mault to 44 months of incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.      INTRODUCTION

The defendant, James Phillip Mault, violently attacked the United States Capitol on January 6, 2021—providing valuable aid to a mob that interrupted the certification of the 2020 Electoral College vote count, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in damage.[1]

Mault, a former iron worker and member of the United States Army, planned for violence on January 6.[2] On January 2, 2021, he told friends who would travel with him to Washington, D.C.

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[2] As a result of this case, Mault is pending discharge from the Army.

to arm themselves with batons, pepper spray, and "asskicking boots." On January 3, 2021, he told his codefendant, Cody Mattice, that he bought pepper spray and a baton that he would drop off for Mattice to bring to Washington.

During the riot, Mault encouraged police officers to stand aside and allow the rioters to invade the Capitol Building while it was still occupied by Members of Congress. When the vastly outnumbered officers refused to give way, Mault and Mattice led the mob that penetrated the police line in the West Plaza, forcing officers to retreat to the Lower West Terrace. Later, with great personal effort, Mault made his way to the mouth of the Lower West Terrace tunnel and used chemical spray against the police officers who refused to yield to Mault and his confederates. Mault then obtained another canister of pepper spray that he gave to another rioter who used it to attack officers in the tunnel. The officers already had endured more than an hour of violent attacks before Mault assaulted them and helped others assault them. Rather than protecting and defending our nation and its Constitution, Mault used his military training and discipline in service of this violence.

After committing these offenses, Mault lied to FBI agents, minimized and denied his unlawful conduct, parroted baseless conspiracy theories, and, incredibly, portrayed himself as a victim of the events of January 6. While he now has accepted responsibility by pleading guilty and admitting to his conduct on January 6, 2021, Mault's past statements and attitude demonstrate that he poses a substantial risk of committing future political violence.

Accordingly, the government recommends that the Court sentence Mault to 44 months of incarceration, which is near the top of the advisory Guidelines' range of 37 to 46 months. A 44-month sentence reflects the gravity of Mault's conduct, credits his acceptance of responsibility,

and meets the needs of general and specific deterrence.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The day started out calmly enough. As set forth in the PSR and the Statement of Offense incorporated into Mault's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary

3

and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* ECF 48 (Statement of Offense), ¶¶1-7.

### 1. Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at

https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT"). The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. Exhibit 5; "Inauguration at the U.S. Capitol," Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

5



*Figure 1: The Lower West Terrace tunnel, as seen on Inauguration Day*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way

into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray. The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the assault of USCP Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force. Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area. It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including members of Congress.

### 2. Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10,

2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.").

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id.* at 27-30.

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

### B.   Defendant James Mault's Role in the January 6, 2021 Attack on the Capitol[3]

#### 1.   Planning to Travel to Washington, D.C.

On January 2, 2021, Mault began texting with his co-defendant, Cody Mattice, to plan for their trip from Brockport, New York to the Capitol. They discussed leaving on Tuesday night, January 5, so that they could drive through the night and arrive early on January 6. On January 3, Mault texted Mattice to say that he had bought Mattice "[s]ome pepper spray and a legal baton." Mattice added that he had a "nice ass high powered firemans fire extinguisher" that they could keep in the vehicle to repel crowds, if necessary.

On January 5, beginning at around 12:30 p.m., Mault texted Mattice and several others that they would meet that evening at 6:30. Mault suggested that the others bring long sleeves, gloves, a baton, pepper spray, "asskicking boots," a helmet, and eye protection. Another person suggested bringing "extra layers for some padding," and Mattice wrote that "I'm layering up on clothes I ain't worried about losing." That other person proposed that he "might do the prison trick and tuck some paper magazines in my jacket to stop knives." Mattice wrote that this would be a good idea. Mault wrote that he "heard of another prison trick were you hide things inside of your anus. It's called a prison wallet." He then told the group "[o]h yea guys drop everything from your wallet

---

[3] The government previously submitted video evidence, which was documented in a Revised Report on Video Evidence Supporting the Defendants' Statements of Offense, *see* ECF 42. The government may submit some or all of the videos again as sentencing exhibits and play from them at sentencing.

you don't need."

## 2.   Approach to the Capitol

Before setting foot on Capitol grounds, and before interacting with police officers, Mattice and Mault revealed their intent to engage in violence. On January 6, 2021, at about 12:39 p.m., Mattice and Mault were standing among a crowd near the National Museum of African American History and Culture. As Mault stood nearby, Mattice recorded a video conveying his criminal intent and foreshadowing his violent conduct that afternoon. He explained, "We're all getting ready to go march on Capitol Hill. We're gonna go fuck some shit up. It's about to be nuts." A moment later, he added, "let's do this. Let's fucking do this. I can't wait." At about 12:48 p.m., as Mault and Mattice marched east, together, Mattice recorded another video in which he said, "It's a march on Capitol Hill. Nobody's happy, no one's satisfied. Time to fuck shit up." At about 1:07 p.m., after arriving on Capitol Hill, Mattice recorded another video, in which he said, "Here we are, Capitol Hill. We're getting up front, and we're taking this shit. Make no mistake, over 1,000,000 fucking people here. Done. Done."[4]

---

[4] These time stamps are taken from the metadata on the video files seized from Mattice's camera. All of the time stamps appear to be an hour early: for instance, the video in which Mattice says "Here we are, Capitol Hill," is time-stamped 12:07 p.m., not 1:07 p.m. The government infers the correct times by comparison to other known events. The clearest example of this involves the assault at the LWT tunnel. The video in which Mattice and Mault discuss climbing up to the tunnel, discussed *infra* at page 16, is time-stamped 2:55 p.m. But it is clear from CCTV footage and body-worn camera footage that they actually climbed toward the tunnel about an hour later.



*Figure 2: Mault, wearing a hardhat, before he and Mattice approached the Capitol building.*

### 3.   Conduct in the West Plaza

By at least 2:15 p.m.,[5] Mault and Mattice had made their way to the front of the crowd of

rioters in the West Plaza and stood near the police line. Shortly before the police line was breached

at 2:28 p.m., Mault implored police officers to abandon their defense of the Capitol and join with

the mob. He shouted at officers:

> Don't you know? You know what's happening. You watch it. This – I know this
> hurts, man. This hurts. I have family that are cops and (inaudible). I served, dude.
> You (inaudible) served. Most of you guys served. We fought for a free country. We
> fought for this. We didn't fight for the communists, man. You know that. You know
> that. We didn't fight for the fucking communists. Fuck that. This is our country.

---

[5] The video containing Mault's statements was 13 minutes long, and other evidence establishes
that the police line was breached at 2:28 p.m., so the video began by 2:15 p.m. at the latest. It might
have been recorded earlier. The metadata indicates that the video was recorded at 2:21 p.m. (given
the hour error described *supra* in note 4) If that metadata information represents the end of the
recording, the video would have begun at 2:08 p.m. Either way, Mault made these statements—
and Mattice recorded them—within about twenty minutes before the breach of the police line.

This is ours. The government is – wake up. Wake up. We – are – were – Just wake up, guys.



*Figure 3: Mault pleads with police to stand down and join the mob.*

Mault also told officers "Your jobs will be here when you come back after we kick the shit out of (inaudible)." A short time later, Mault justified the mob's conduct, telling officers, "This shit's [i.e., the rioters' shared cause is] fucking right. What we're doing is right, or there wouldn't be this many fucking people here. And you guys fucking know this shit." Then, he said, "We had your guys' back when you were under attack. We always had your fucking back, every fucking time." Moments later, Mault told officers, "I obey the fucking law every goddamn fucking day. Every fucking day. Where the fuck's it get me? Everyone else (inaudible) breaks the law and they get away with (inaudible)."

While Mault stood at the front of the crowd, face-to-face with officers and next to Mattice, Mattice pulled down a segment of the metal barricades that stood in front of a police line. Mattice

quickly grabbed it with both hands, pulling it away from the police and onto the ground. The exact time of this incident is unknown, but likely took place between Mault's comments to police (above) and the crowd's breach of the police line (below).



*Figure 4: Mattice grabs a segment of the metal barricade and pulls it to the ground.*

At about 2:28 p.m., Mault, Mattice, and their fellow rioters breached the police line in the West Plaza and forced officers to retreat for their own safety. They pushed against the line of officers, broke the line, and forced the police barriers apart. Through their collective effort, they overwhelmed and surrounded the police, who retreated—an inflection point in the rioters' successful push into the Capitol Building. Mattice was pepper-sprayed in the process, and video recorded shortly after the breach shows him rinsing out his eyes. A few minutes later, Mattice told Mault that he was sprayed directly in the eyes, and that he could barely see. He and Mault discussed leaving the West Plaza to meet up with their other travel companions at their "rally point," and Mault said they could meet up with the others, then "we'll come back."



*Figure 5: Mattice, Mault and other rioters push through the police line.*



*Figure 6: Seconds later, the police line collapsed. Mault and Mattice are to the right, out of the frame.*



*Figure 7: Mattice, suffering from the effects of chemical spray. Mault stands to Mattice's right, slightly out of the frame.*

### 4. Mattice's Text Messages with his Friends and Family[6]

From about 3:03 p.m. to about 3:41 p.m., likely after he had time to recover from the effects of the chemical spray, Mattice texted with family members and friends about the events in the West Plaza. These texts reveal Mattice's contemporaneous understanding that he and Mault played a key role in breaching the police line. Mattice told one person "We took capital hill bro." [7] This person asked, "is there any antifa there," and the defendant replied, "Not yet but bro me and james were the first to shove through the police line to the doors." In response to an earlier text message from his brother asking if he "was good," Mattice texted at 3:23 p.m. that he had "Never been

---

[6] As the Court will see, Mattice's text messages contain a number of spelling or grammatical errors, some of which may have been his own and some of which may have arisen from his phone's autocorrect feature. Beyond a limited use of bracketed corrections to aid readability, this sentencing memorandum reproduces these text messages as they appeared in Mattice's phone.

[7] This person's name is not recorded in Mattice's cell phone.

fuck8n better bro me and james got everyone to push through the police, me and james fought

through the police line on the door step of Capitol hill lmao."[8]

Mattice's aunt also texted him to ask if he was okay. Mattice told her "I was on the very

front line and took capitol hill." When his aunt expressed concern for Mattice, noting that gunshots

had been reported inside the building, he responded that he did not go inside, that he and Mault

were holding the outside, that he yanked a crowd-control gate away from a police officers, and

that he and Mault "fought off like 4 or 5 cops and stand fucking victorious."

### 5. Mattice's and Mault's Joint Assault on the Lower West Terrace Tunnel at about 4:00 p.m.

By around 4:00 p.m., after Mattice had time to recover from the effects of chemical spray,

he and Mault approached the LWT tunnel.  The crowds were thick. Mattice's video captured either

he or Mault (it is unclear whom) ask, "Want to get up there?" and the other responded, "Yeah, let's

go." Mattice attempted to push through the crowd, then climbed up and body-surfed over members

of the crowd. Mault followed behind him, similarly body-surfing across the top of the crowd and

toward the tunnel.

---

[8] LMAO stands for "laughing my ass off." It is similar in meaning to LOL ("laughing out loud"), but generally is used to convey greater emphasis.



*Figure 8: Mault climbing toward the Lower West Terrace tunnel.*

As they approached the tunnel, other rioters threw objects and sprayed a chemical agent at the uniformed officers inside the tunnel. One rioter hung off a wooden, arched frame below the stone archway, kicking at officers and using a metal pole as an improvised spear to stab at them. After Mattice reached the tunnel and as Mault began to climb, the crowd began to chant "Pull them out." Evidently, they were referring to the police officers.

Mattice reached the tunnel, then either grabbed onto and hung from the wooden frame directly beneath the arch and/or was supported by members of the crowd. Mault also grabbed onto and hung from the arch. Once there, Mattice obtained a small canister of chemical spray from another rioter, then sprayed the contents at police officers defending the tunnel. He held his thumb on the canister, discharging chemicals at police officers for about ten seconds. Moments later, Mattice fell backwards into the crowd. Mault assaulted police shortly thereafter, also obtaining a canister from another rioter and deploying its dangerous contents at police officers. At some time

17

thereafter, Mault and Mattice left the restricted area. The government has not identified any relevant conduct by either defendant after their attack on the officers inside the tunnel.



*Figure 9: Mault using a chemical spray to assault a police officer in the tunnel.*

### 6.  Statements after the Riot

Mault and Mattice showed no remorse for their crimes in the immediate aftermath of the riot. On January 8, 2021, Mattice sent Mault two videos that apparently asserted that the January 6 riot was staged by the former President's enemies in order to justify a second bill of impeachment. Mault and Mattice then exchanged a series of text messages about the riot:

| | |
|---|---|
| Mault: | I've seen it [the videos] crazy shit |
| Mault: | I've been watching this stuff since o got home |
| Mault: | I feel so fucking used I'm sick to my stomach |
| Mault: | It's all so fuckibg obvious now |
| Mault: | They used my love for my country and straight raped it |
| Mattice: | I've been watching everything too bro, nothing to feel sick about tho we didn't do anything wrong and we had no idea they were infiltrating trying to turn it into something it wasn't, wat we did was constitutional and |

| | |
|---|---|
| | lawful, wat they did was wrong bro |
| Mault: | They took the love I have for my country and straight raped it |
| Mattice: | Hold ur head up bro ur a fucking hero |
| Mault: | Yeah that is true we never did hit police |
| Mault: | Just protested |
| Mault: | You know what's funny is they said once get back lol |
| Mattice: | I know man but nothing we can do, we didn't destroy anything or try getting inside the capitol we marched on and protested |
| Mault: | Yea I'm getting in my own head |
| Mattice: | We didn't fight back just took our licks like men and stood strong bro |
| Mault: | Just hurt that the country I served would do this to me |
| Mault: | Fucking cocksuckers |
| Mattice: | Come by if you want today and we'll smoke and chill bro |
| Mault: | Yea I fuckibg might |
| Mattice: | I know wat u mean tho dude it was really wrong of them to pull the sheets over our heads bro |
| Mattice: | We can talk about it bro, mite help u feel better |
| Mattice: | Plus I got shit I wanna show u, ur mind will definitely be eased bro |
| Mault: | I can handle the future it's just coping with the shit I did |
| Mault: | And fucking witnessed |
| Mattice: | U didn't do anything wrong tho man we weren't the assholes destroying shit and attacking the police |

Remarkably, in this private dialogue, Mault and Mattice characterized themselves as victims claimed they had done nothing wrong. Although each told the other that they did not assault the police, those statements, glossed over (to put it charitably) the fact that both fired chemical irritants directly at the officers, which was clearly an assault, even according to a layman's understanding of the term. The conversation continued along this vein, with added, conspiratorial thinking about whether other rioters were secret members of Antifa, posing as rioters to set up the former President.

### 7.   Mault's First interview with FBI

On January 18, 2021, FBI agents interviewed Mault in Brockport, New York. At the time, agents were aware that Mault had been identified in videos obtained from the LWT and that he was near the mouth of the tunnel. However, the agents did not know about the footage of Mault

assaulting police officers. The investigators also were local to Rochester, New York, so they were unfamiliar with the layout of the Capitol grounds.

Mault provided an incomplete, deceptive, and largely self-serving account of his actions at the Capitol. He acknowledged traveling to Washington, D.C. to attend the former President's rally, but did not identify the five friends with whom he traveled. He admitted wearing his hardhat to the rally but claimed that he donned the helmet to protect himself against imaginary attacks from Antifa supporters and to show union support for the former President. He did not disclose his text messages with Mattice and others in the days before January 6, in which his group anticipated violence.

Mault similarly was deceptive about his conduct on restricted Capitol grounds. Mault falsely claimed that he was caught up in a crowd of people pushing closer to the building, which forced him to move toward the building. But subsequent identification of Mault and Mattice in other video footage from that day revealed that they were aggressors. Mault implored officers to stand down and was part of a group that assaulted the police line and pushed forward against the officers who attempted to keep the rioters from advancing. Mault climbed to the LWT and then crawled on top of the crowd toward the tunnel, where he sprayed officers with dangerous chemical agents and provided pepper spray for another rioter to incapacitate uniformed officers. While Mault acknowledged ending up next to an entrance to the Capitol building and witnessing assaults against police officers, he failed to admit that he went to great effort to reach the front of the crowd and personally assaulted officers with chemical spray.

Moreover, Mault bemoaned the negative publicity to which he and other rioters were being subjected. He told FBI agents that he was an Army veteran who wanted what was right for his

country. Mault claimed to be upset that millions of people like him—presumably, supporters of the former President—were being branded as terrorists because of the actions of a few individuals who hijacked a peaceful rally for their own purposes. Of course, Mault was no innocent bystander to the events of January 6, 2021 and his intent and conduct were by no means peaceful.

### 8.   Mault Re-Enlisted in the Army

Mault was fired from his union job after the events of January 6, 2021. Thereafter, he re-enlisted in the Army. On April 23, 2021, he filled out a Standard Form 86 Security Clearance Application (SF-86). Mault made no mention on this form, or during his application process, of his criminal conduct on January 6, 2021. During the custodial interview, discussed below, he spoke with the FBI about re-enlisting, and told the FBI that he viewed his ability to re-enlist as evidence of his innocence. "Why would they let me join if I was a threat? Why would they let me join the federal government and be a soldier if I was a threat?" he asked, rhetorically.

### 9.   Custodial FBI Interview

Following his arrest, Mault submitted to a custodial interview with FBI agents in Fayetteville, North Carolina. Again lamenting his own situation, Mault generally described the riot as an overwhelming, traumatic event from which he took a long time to recover. He claimed that he feared being "pushed into that hellhole" (from context, likely the mouth of the LWT tunnel). He claimed that this "was a funnel, and I didn't want to be in it," but that he stayed because he lost track of his friend (likely, Mattice). Mault further claimed that he had not intended to hurt anyone, never pushed anyone, and would never hit a police officer. He claimed to "have the utmost respect for those guys who sign up and do that."

Of course, his claims again were lies. Mault was involved in pushing against and breaching

a police line in the West Plaza. Even if he did not strike an officer with his fists or an object, he certainly assaulted police officers with pepper spray in the LWT and assisted others to do so. But when confronted with his own conduct, Mault had no explanation:

> Mault:      But I know I didn't assault any police officers, or hit any police officers, or have a deadly weapon on me. Like that's just perplexing me. A deadly weapon.
> FBI Agent:  Why the pepper spray?
> Mault:      People were handing that out, into the crowd. I mean, you have the picture. Right at that point in time . . . I guess it was emotions. I was sad.
> FBI Agent:  Who were you aiming it at?
> Mault:      Not going to answer that.

Echoing the bogus defenses of other Capitol riot defendants, Mault claimed to be ignorant that he was not supposed to be on restricted Capitol grounds. He told the FBI, "when you see officers letting people into the Capitol building . . . how are you supposed to know, at that time, what are public grounds? … So why wouldn't we be able to be there?" Mault's conduct on January 6 is the answer to that question. He knew he wasn't allowed in the restricted area because, far from letting the rioters into the Capitol building, he saw police fighting valiantly, in the West Plaza and LWT Tunnel, to keep rioters out. But he harangued officers to abandon the defense of the Capitol, fought to breach a police line at ground level, and then fought to penetrate a crowd of police that were standing in defense of the doorway.

Mault continued to deny responsibility and repeat conspiracy theories during his interview. He asserted that he traveled to the Capitol because he was "pretty upset for obvious voter fraud." He questioned why there were so few police present, and why the National Guard did not arrive to stop the rioters. He also wondered why the police were standing in a line (presumably in the West Plaza) and not talking with rioters. He suggested that his inability to record phone video and

call his wife was evidence of a government cover-up to prevent communication.[9]

### III.    THE CHARGES AND PLEA AGREEMENT

On October 5, 2021, Mault was charged with various offenses by a sealed complaint. He was arrested on October 7, 2021. On November 5, 2021, a federal grand jury returned an indictment charging Mault with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count Three); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Count Five), and several misdemeanors.

On April 22, 2022, Mault pleaded guilty to Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1), a lesser-included offense of Count Five of the Indictment.

### IV.    STATUTORY PENALTIES

As noted by the plea agreement and the U.S. Probation Office, Mault faces up to eight years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for his violation of 18 U.S.C. § 111(a)(1).

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive

---

[9] Mattice was texting with his family throughout the day, and Mault was at his side throughout; it is likely that Mault knew that his friend was able to send and receive text messages.

empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Consistent with the parties' stipulation in the plea agreement, the U.S. Probation Office correctly calculated the defendant's offense level at 21 (PSR ¶¶ 41-51) and his criminal history as category I. (PSR ¶ 54.) Accordingly, Mault's Guidelines imprisonment range is 37 to 46 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to government officials, law enforcement officers and, of course, our democratic norms. It was one of the only times in our Nation's history when the Capitol building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events. While each defendant should be sentenced based on his or her own conduct, each individual person who entered the Capitol grounds on January 6 did so as part of a larger crime to which his or her personal conduct directly contributed. Mault, who helped

24

breach the police line and impeded law enforcement officers, aided and abetted those who entered the Capitol and committed other crimes therein.

While looking at the defendant's individual actions, we must assess such conduct on a spectrum. This Court, in considering § 3553(a), should look to a number of critical factors, including: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged or engaged in violence; (3) whether the defendant encouraged or engaged in any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, deceived, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

In light of these factors, and as reflected in the Sentencing Guidelines, a significant sentence of incarceration is warranted. Mault did not enter the Capitol building, but not from any lack of trying. He fought hard to get in and helped create the circumstances allowing the breach of the building and unlawful entry of other rioters. He made clear, in pleading with law enforcement officers to stand aside, that violence against Members of Congress was his goal. He assumed a leadership role within the mob, trying to persuade officers to abandon their defense of the Capitol and breaking the police line in the West Plaza. He engaged in violence, first at the front of a crowd that pushed into officers, then an hour and a half later, at the mouth of the LWT tunnel, when he attacked officers with chemical spray and provided such spray for other rioters.

It is significant that, at about 2:30, Mault and Mattice stepped away from the violence so that Mattice could wash out his eyes and recover from exposure to police chemical spray. After separating from the conflict, Mault and Mattice could have left the Capitol grounds. Alternately, they could have remained on the Capitol grounds, but withheld further violence. Mault could have displayed his "utmost respect" for the officers by encouraging other rioters to leave. Instead, Mault and Mattice doubled down on their violent conduct, strenuously working their way to the mouth of the LWT tunnel to further assault police officers. This took great effort: they had to work their way through a dense crowd and, ultimately, crawl over the heads of other rioters to reach the tunnel. And, the seriousness of this attack cannot be overstated. Not only was the LWT the site of some of the worst violence on January 6, 2021, but the officers defending the tunnel were the last line of defense between the Capitol building and a substantial portion of the mob.

When Mault reached the tunnel, he took a canister of chemical spray from another rioter and—without a second thought—pointed it at a police officer and attempted to discharge it. In his interview, Mault expressed surprise that he was charged with a weapons offense, and then described receiving a canister of chemical spray as if it was a party favor ("People were handing that out, into the crowd.") That Mault encouraged his friends to bring pepper spray, before the fact, then willingly accepted and used a chemical canister from a stranger speaks volumes about his purpose at the Capitol.

At no time since January 6, 2021 has Mault shown sincere remorse for his behavior, and it still is not clear that he appreciates the seriousness of his conduct. Accordingly, a substantial sentence of incarceration is warranted.

26

### B.  Mault's History and Characteristics

Mault is a veteran of the U.S. Army. He has a single prior criminal conviction for driving while impaired. While the Presentence Report suggests that the defendant's prior military history might be considered as a mitigating factor and may support a downward variance from the Sentencing Guidelines range (PSR ¶ 134), the government submits that Mault's military service has aggravating features, a "double-edged sword" as it were, that further supports a sentence at the high end of the Guidelines range.

Mault was not a member of the military at the time of his crimes. But he has used his status as a veteran as both a sword (providing him the skills to participate in the January 6 riot) – and a shield (using his service to deflect responsibility). Given those circumstances, this Court should not treat Mault more leniently because he once took an oath to defend the Constitution years before subverting it.

Mault misused his training and service when he appealed to the law enforcement officers as a member of the military, as he encouraged them to yield to the rioters. He misused his training and service when he used his skills to battle police, help his friend recover from exposure to chemicals, and helmed a post at the front of the crowd in the LWT. Mault even used his military service to suggest his innocence, suggesting that the United States Army co-signed his behavior on January 6 by permitting him to re-enlist.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly

administration of the democratic process."[10] As with the nature and circumstances of the offense, this factor further supports a significant sentence of incarceration. Mault's criminal conduct, assaulting a law enforcement officer in order to stop the certification of a Presidential election, is the epitome of disrespect for the law. Mault knew that Members of Congress and the law enforcement officers who tried to protect them were under siege. Indeed, he called on officers to stand aside and allow rioters through, then was part (if not a leader) of the siege, part of the collective action that held Members hostage and put them in fear for their lives. Mault participated in an attack on the rule of law. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[10] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### *General Deterrence*

A significant sentence of imprisonment is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[11] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As explained by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor

---

[11] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Mault has no prior history of violent crime. And yet, for many of the January 6 defendants, the question is not whether they will commit future violence *in general*. Instead, the question is whether they pose a risk of future political violence: whether, faced with an election result they do not like, they will gather with other like-minded individuals and try—once again—to overturn a legitimate process by force. Democracy, after all, depends on the consent of both winners and losers. It depends on our common commitment to a process that is more important than any one single outcome. Through his behavior on January 6, and his deceptive and self-serving statements since, Mault has revealed an ongoing unwillingness to conform his behavior to the rule of law.

Two days after the riot, Mault and Mattice exchanged text messages about what "really" happened at the Capitol. Mault claimed that he felt sick about being "used" as an excuse to impeach the former President, equating that feeling to being raped—then repeating his point, as if to emphasize that his choice of language was not a mistake. In fact, Mault knew better: he was there to support the former President and oppose the certification of the electoral college votes. He plainly knew that other rioters were there for the same purpose, and he stood shoulder-to-shoulder with others who fought to penetrate police lines in the West Plaza and LWT. They were not pawns in a scheme to make it look like the former President's supporters attacked the Capitol, but rather, the former President's supporters (including Mault) <u>did</u> attack the Capitol—and Mault knew it. But despite that knowledge, he agreed when Mattice said—falsely—that "we didn't destroy

anything or try getting inside the capitol we marched on and protested." Both defendants denied their own behavior to soothe their own feelings and cast themselves as heroes.

Mault continued to falsely present himself as aggrieved during his two interviews with the FBI. In his first interview, he claimed that he was pushed toward the mouth of the tunnel against his will; video immediately and decisively reveals this to be a lie. He claimed that he, and other supporters of the former President, were unfairly being labeled as domestic terrorists because of the actions of a small handful of people; in fact, he actively participated in the January 6 riot, including by assaulting uniformed officers with dangerous chemical spray. Indeed, to the extent that the former President's supporters were unfairly labeled in the wake of January 6, 2021, it was because of people like Mault.

During his custodial interview, Mault again lied about his conduct. He professed ignorance that he was in a restricted area and repeated conspiratorial nonsense to blame others rather than acknowledging wrongdoing. To this day, Mault has not expressed regret or remorse for his conduct. He has accepted responsibility by pleading guilty, and for that he receives credit under the Sentencing Guidelines. But his guilty plea should not be taken as evidence of a change of heart, or a lack of risk of future violence. It is clear that the evidence of his guilt is overwhelming, and that he had no realistic possibility of an acquittal at trial.

E.      **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the

January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.      Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 111(a)(1) defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

This case bears significant similarities to others in which defendants were convicted by guilty plea of assaulting police officers during the riot at the Capitol on January 6, 2021. In those other cases, this Court and others have imposed lengthy sentences of incarceration. Indeed, in some of those cases, courts have imposed sentences similar to that requested by the government, here. *E.g., United States v. Rubenacker*, 1:21-cr-193 (BAH) (41 months' incarceration); *United States v. Creek*, 1:21-cr-645 (DLF) (27 months of incarceration); *United States v. Thompson.* 1:21-cr-461 (RCL) (46 months of incarceration); *United States v. Languerand*, 1:21-cr-353 (JDB) (44 months of incarceration); *United States v. Palmer*, 1:21-cr-328 (TSC) (63 months of incarceration); *United States v. Fairlamb*, 1:21-cr-120 (RCL) (41 months of incarceration); *United States v. Miller*, 1:21-cr-75 (RDM) (33 months of incarceration).[12] In *Creek*, *Thompson*, *Palmer, Rubenacker*, and

---

[12] Palmer's sentence is substantially longer than other sentences cited here and the sentence the government recommends in this case. That's because his criminal conduct was more violent than in these other cases.  In two different locations, Palmer assaulted officers with a variety of weapons

*Fairlamb*, this Court and others imposed sentences within the Guidelines range. In *Laguerand* and *Miller*, the sentencing judges varied downward from the Guidelines range based on factors that do not apply here.[13]

Mault's criminal conduct here is similar to that in *Creek* and *Miller*. Creek was part of the group of rioters that breached the police line in the West Plaza, as was Mault. After Creek pushed through the police barriers with other rioters, he forcefully drove an officer back, then hit the officer in his face shield. He shoved and kicked another officer. *Creek*, Sent. Tr. 05/02/2022 at 58-59.[14]

Like Mault, Miller activated a fire extinguisher into the LWT tunnel at the officers defending the tunnel from the mob. *Miller*, Sent. Tr. 05/23/2022 at 69-70. He also joined a crowd that chanted "heave ho!" as, together, they pushed into that police line, crushing officers against each other, the tunnel walls, and the doors into the Capitol building.

Mault, in contrast, was present in both locations, and involved in assaults against the police

---

including a wooden plank, the contents of a fire extinguisher, the fire extinguisher itself (twice), and a pole he used as an improvised spear. *Palmer* Sent. Tr. at 39-40, Dec. 17, 2021.

[13] *Languerand*, Sent. Tr. at 39, Jan. 26, 2022 (varying downward due to the defendant's difficult childhood and acknowledgement and regret for violent conduct); *Miller*, Sent. Tr. at 73-74, May 23, 2022 (varying downward due to the defendant's age, intoxication, and "exemplary record" before January 6, 2021). Additionally, in *United States v. Leffingwell*, 1:21-cr-5 (ABJ), the court varied downward due to defendant's expressions of remorse, multiple traumatic brain injuries, and the effect his conviction and sentences would have on his disability benefits. Sent. Tr. at 39-56, Feb. 10, 2022.

[14] Although the government argued that Creek used a ratchet strap as a dangerous weapon, the court in *Creek* was unable to find that Creek used a dangerous weapon, and thus did not apply the corresponding Sentencing Guidelines enhancement. *Creek*, Sent. Tr. at 59-60, May 2, 2022. Here, in contrast, it is clear that Mault did use a dangerous weapon: chemical spray.

line at each. His conduct also resembles the conduct at issue in *Fairlamb, Palmer, Thompson, and Rubenacker*, all of which (except for Palmer) led to comparable sentences.[15]

Of course, the Court should also consider the comparison of Mault's case to his co-defendant, Cody Mattice. Mattice and Mault's conduct was nearly identical. They traveled together, marched to the Capitol grounds together, and stood before the police line together. As Mault called on officers to abandon their post, Mattice stood next to him, recording. Mattice and Mault acted together when they led other rioters to breach the police line in the West Plaza. They stayed together when Mattice's eyes needed care, then rejoined the fray together. Both climbed to the LWT tunnel, both sprayed chemicals at Officer M.A. and others within. And, after the riot, both texted with each other in an apparent attempt to soothe their own hurt feelings that they were being cast as villains—and to create their own narrative about how and why their conduct was acceptable. When the FBI confronted them about their conduct, both similarly failed to acknowledge what they have done. And now, both fail to show remorse. The need to prevent unwarranted sentencing disparities counsels a similar—or the same—sentence for each of them.

---

[15] In *Fairlamb*, the defendant participated in multiple assaults on officers. *Fairlamb* Sent. Tr. at 6-10, Nov. 10, 2021. He was sentenced to 41 months because of his early plea. *Id.* at 37. Palmer's conduct is discussed *supra* in note 12. In *Thompson*, the defendant engaged in numerous assaults during the 13 minutes he was present in the LWT tunnel. *Thompson* Sent. Tr. at 5, Dec. 20, 2021. In *Rubenacker*, this Court imposed a 41-month sentence in a case where the defendant entered the Capitol through the Senate Wing Doors, right after it was breached, approached and yelled at an officer, re-entered the Capitol from the east side after leaving it, harassed and taunted multiple officers, swung a plastic water bottle at officers, and sprayed liquid at multiple officers. *Rubenacker* Sent. Tr. at 147-51, May 26, 2022. Mault, like Rubenacker, had the chance to leave after his first bout of criminal conduct; instead, he chose to rejoin the fight at another location.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[16] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer M.A., did not suffer bodily injury as a result of Mault's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Mault must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Mault played in the riot on January 6.[17] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the

---

[16] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[17] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Architect of the Capitol in mid-May 2021. *Id.* Mault's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 129.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 44 months, which is near the top of the Guidelines range as calculated by the Probation Office and agreed upon by the parties in the plea agreement, three years of supervised release, restitution of $2,000, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Michael J. Romano*
MICHAEL J. ROMANO
IL Bar No. 6293658
Trial Attorney, Detailee
555 4th Street, N.W.
Washington, D.C. 20530
Telephone No. (202) 307-6691
michael.romano@usdoj.gov

*/s/ Jordan A. Konig*
JORDAN A. KONIG
Trial Attorney, U.S. Department of Justice
Detailed to the U.S. Attorney's Office
For the District of Columbia
P.O. Box 55, Washington, D.C. 20044
202-305-7917 (v) / 202-514-5238 (f)
Jordan.A.Konig@usdoj.gov

37